**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| INLINE PLASTICS CORP., <br> a Connecticut corporation, <br><br>               Plaintiff, <br><br>   vs. <br><br> LACERTA GROUP, INC., <br> a Massachusetts corporation, <br><br>              Defendant. | <br><br><br><br><br><br> Civil Action No.:  4:18-cv-11631-TSH |

## <u>LACERTA'S RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

Pursuant to Federal Rule of Civil Procedure 50(a), Defendant Lacerta Group, Inc. ("Lacerta") hereby respectfully moves for judgment as a matter of law that (1) Lacerta has not infringed any of U.S. Pat. Nos. 7,118,003 (the "'003 Patent"); 7,073,680 (the "'680 Patent"); 8,795,580 (the "'580 Patent"); 9,527,640 (the "'640 Patent"); and 9,630,756 (the "'756 Patent") (collectively, the "patents-in-suit"), (2) Plaintiff Inline Plastic Corp. ("Inline") has not offered sufficient evidence to entitle it to lost profits damages even were infringement proven, and (3) Inline has not offered sufficient evidence for a jury to calculate a reasonable royalty for infringement of claims 1-3 and 6 of the '640 Patent.

## <u>LEGAL STANDARD</u>

Under Rule 50(a) of the Federal Rules of Civil Procedure, a party is entitled to judgment as a matter of law if, after the non-movant has been fully heard, a reasonable jury would not have a legally sufficient evidentiary basis to find for the non-movant. *Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 26 (1st Cir. 2019). The Court must view the evidence and draw all fair inferences in the light most favorable to the non-movant. *Trainor v. HEI Hospitality, LLC*, 699 F.3d 19, 26 (1st Cir. 2012). To warrant submission to the jury, the non-movant must present more than a mere scintilla of evidence

in support of its claims, and may not rely upon conjecture and speculation.  *American Steel Erectors v. Local Union No. 7*, 815 F.3d 43, 52 (1st Cir. 2016).

## ARGUMENT

### I.   Lacerta is Entitled to Judgment of Noninfringement as a Matter of Law.

Inline alleges that Lacerta products TE-RT-64, TE-RT-120, TE-RT-16, TE-RT-48, TE-RT-56, TE-RT-74, TE-RT-35, 21799, TE-RPF-9, TE-RP-8, TE-RFP-11, 24105-3C, 24104-2C, TE-SUB-12, TE-W2, TE-W3, TE-WR-LR, and TE-WR-SM (the "Accused Products") each infringe one or more claims of the patents-in-suit.  *See* Dkt. No. 114-5, Inline's Third Revised Preliminary Infringement Contentions.  A patent holder must prove infringement by a preponderance of the evidence.  *S. Bravo Sys., Inc. v. Containment Techs., Corp.*, 96 F.3d 1372, 1376 (Fed. Cir. 1996).  Viewed in the light most favorable to the plaintiff, there was insufficient evidence in Inline's case-in-chief from which the jury could find that Lacerta infringed any of the patents-in-suit.

Pursuant to the Court's ruling on Lacerta's Motion to Strike Inline's late-disclosed Doctrine of Equivalents infringement theories (Dkt No. 90), the only infringement theory available to Inline is literal infringement.  Dkt. No. 124.  In order to prove literal infringement of any claim of any the patents-in-suit, Inline must prove that "every limitation recited in the claim is found in the accused device, *i.e.*, […] the properly construed claim reads on the accused device exactly."  *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996) (citing *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989)).  "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."  *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).  A directed verdict of non-infringement is appropriate when the claims, as properly construed, cannot be read to cover the accused products.  *See Newell Cos. v. Kenney Mfg. Co.*, 606 F.Supp. 1282, 1285, 1298 (D.R.I. 1985) (granting directed verdict of non-infringement where accused products did not include element of asserted claim).

Inline failed to proffer sufficient evidence from which the jury could find that the Accused Products literally infringe any claim of the patents-in-suit that Inline must prove at trial are infringed.[1] Despite a conclusory repetition of the words "literally" and "definitely infringe" during its technical expert's testimony, Inline did not identify any literal infringement, i.e., where "the properly construed claim reads on the accused device exactly." *Cole*, 102 F.3d at 532.

As detailed below, Inline did not meet its burden to provide a legally sufficient evidentiary basis for the jury to find that certain limitations – such as "upwardly projecting bead," an "upper peripheral rim," and/or where the foregoing are "configured to render the outwardly extending flange of the cover portion relatively inaccessible" or to "hinder access to the container" "when the container is closed" – are literally met.  Because one or more of these limitations applies, either explicitly or by dependence,[2] to each of the asserted claims, Inline's failure to prove that the Accused Products literally meet these limitations means a reasonable jury would not have a legally sufficient evidentiary basis to find infringement as to any of these claims.

**A.      The Accused Products do not contain an "Upwardly Projecting Bead".**

All of the asserted '003 Patent claims and '680 Patent claims require, either explicitly or by dependence, an "upwardly projecting bead."[3]  Trial Exh. 1 ('003 Patent); Trial Exh. 2 ('680 Patent). Claim 5 of the '640 Patent also explicitly requires an upwardly projecting bead.  Trial Exh. 5 ('640 Patent) at 12:21–29.  Under the Court's construction, an upwardly projecting bead is a "raised portion of the upper peripheral edge that substantially surrounds the outer edge of the outwardly extending peripheral flange."  Dkt No. 53 at 10.  Inline failed to present evidence sufficient to show that the

---

[1] Lacerta does not address claims 1-3 and 6 of the '640 patent, on which this Court granted Inline summary judgment of infringement, in this Section. Dkt. No. 177 at p. 16.

[2] Where an independent patent claim is not infringed, as a matter of law any claim that depends from that claim cannot be infringed.  *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994).

[3] Inline asserts infringement of claims 1-3, 6, 7, 9, 17-22, 24, and 25 of the '003 Patent, and claims 1-9, 17-21, 23, 25, and 27 of the '680 Patent.  *See* Dkt. No. 298 (Inline's Trial Brief) at 7, 9; Trial Tr., 7-20:16-19 (claim 22 of the '003 Patent).

Accused Products literally contain an "upwardly projecting bead."  The portion of the Accused Products that Inline alleges is an upwardly projecting bead is not a "**raised** portion of the upper peripheral edge that **substantially surrounds** the outer edge of the outwardly extending peripheral flange," as required by the Court's construction.

As Lacerta's designer explained, what Inline identifies in the Accused Products as the "upwardly projecting bead" is merely one section of the smooth and uninterrupted planar upper peripheral edge of the base portion. Thus, it fails to be a "raised portion" as required by this Court's claim construction. Lacerta designer Larry Jewett explained that, on the Accused Products, the upper rim of the base is angled and that when the lid is closed, the edge of the lid "sits on top" of the rim.  Trial Tr., 5-17:14-24; 5-19:2-10.  Mr. Jewett further testified that this angle does not have any functional purpose.  *Id.* at 5-30:17-19.

The testimony of Inline's technical expert, Dr. Kazmer, does not establish that the Accused Products have a structure that meets the "upwardly projecting bead" limitation.  In describing the figures of the '003 Patent, Dr. Kazmer testified that "tamper-resistant is generally provided by the <u>flange of the cover portion lying **within the outer rim** of the base portion</u>." Trial Tr., 6-99:2-4 (discussing Figs. 1, 16 of '003 Patent) (emphasis added).  The Court's claim construction of "upwardly projecting bead" in the claims is consistent with the teaching of the specifications, requiring that limitation be a "**raised portion of the upper peripheral edge** that **substantially surrounds** the outer edge of the outwardly extending peripheral flange."  Dkt. No. 53 at p. 8 ("specifications provide guidance on how to resolve any ambiguity" and "only by surrounding the outwardly extending peripheral edge of the cover with the raised portion of the upper peripheral edge of the base does the container achieve what both parties agree is the functional purpose of the upwardly projecting bead.").  Yet, when purporting to analyze whether the Accused Products meet the limitations of the asserted patents, Dr. Kazmer testified contrary to the

Court's claim construction.  Instead of applying the Court's construction, he improperly substituted a "visual" component, contending the "upwardly projecting bead . . . is the part of the product that <u>conceals that outer flange." Trial Tr., 6-125:1-12 (emphasis added).  This visual "concealing" is irrelevant to and does not establish infringement.  Dr. Kazmer was unable to point to any part of the patents-in-suit that contains language regarding "visual" occlusion or visual blocking of the flange.  *Id.* at 7-62:9-7-63:14. On redirect the day after introducing his "visual" opinion, Dr. Kazmer attempted to disclaim his plainly improper and deficient analysis.  Then, he testified that in addition to "visual blocking,"[4] he found some unidentified physical impediment:

> **Q:** Are there other forms of blocking that you found in the products-in-suit?
> . . .
> **A:** It physically impedes, that is what is required and that is what the accused products do in terms of their design.  The intent is clear.

Trial Tr. 7-68:23-7-69:4.  Dr. Kazmer never identified what "[it]" is that purportedly "physically impedes," what or how "it" physically impedes, nor did Inline's counsel prod any further on this line. The Federal Circuit has explained that this conclusory expert testimony is insufficient to avoid judgment as a matter of law of non-infringement.  *Paradox Sec. Sys., Ltd. v. ADT Sec. Servs., Inc.*, 388 F. App'x 976, 981-82 (Fed. Cir. 2010) (affirming JMOL of non-infringement where expert's "statements were entirely conclusory" and "pointed to no structure" to meet the limitation); *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (affirming JMOL where plaintiff-expert "offered conclusory testimony" and "did not prove infringement because she presented no testimony based on the accused products themselves that supported a finding of infringement.").

When directly asked if the Accused Products have a "raised portion on the upper peripheral edge," Dr. Kazmer first provided no explanation, stating in a conclusory manner only: "They do. They're readily apparent." Trial Tr. 6-128:17-19.  Apparently referring to the angle of the smooth planar surface,

---

[4] Trial Tr. 7-68:19-7-69:4.

Dr. Kazmer testified only that the upper peripheral edge "literally is raised relative to the flange on the cover." *Id.* at 7-11:16-17.  He never explains how this simple angle substantially surrounds the edge of the outwardly extending flange.  *Id.* at 7-11:19-24 ("**Q:** . . . does that substantially surround the outer edge of the outwardly extending peripheral flange in your opinion?  **A:**  Oh, yes, it does.  **Q:** And it literally does so?  **A:**  It literally does.").  At no point did he reconcile the upwardly projecting bead construction with the smooth, uninterrupted plane upon which the flange of the cover portion of the Accused Products lies flat.  To the contrary, when Dr. Kazmer viewed the in-trial demonstration of a horizontal iPhone with sticky notes on top, he acknowledged that even when the iPhone is on an angled tilt upward, counsel could access the notes.  *Id.* at 7-61:15-21.

Dr. Kazmer <u>never</u> testified that, or explained how, the outer edge of the cover flange is "substantially surround[ed]" by a "raised portion of the upper peripheral edge," because it is not.  The undisputed testimony, confirmed by a visual inspection of the accused products, reflects that the outer edge of the cover flange sits <u>on top</u> of the upper peripheral edge.

Inline failed to provide evidence that the "properly construed claim reads on the accused device exactly" as is required for literal infringement.  Instead, Dr. Kazmer's opinion is in practical effect an improper doctrine of equivalents opinion.[5]  Dr. Kazmer testified that the "<u>inclined surface</u>" i.e. the angle, meets the "raised portion of the upper peripheral edge" limitation – an apparent reference to just the first portion of the Court's construction of "upwardly projecting bead."  *Id.* at 6-134:10-18.  He also testified that the "flange is <u>retained within the upward edge of the rim</u>." *Id.* at 6-134:2-3 (emphasis added).  Any contention that the "inclined surface" constitutes a "raised portion of the upper peripheral edge" sufficient to "substantially surround" the edge of the flange as the Court's construction requires is an

---

[5] A doctrine of equivalents analysis would require the patentee show that the accused product "contains an equivalent for each limitation not literally satisfied." *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 463 (Fed. Cir. 2016) (citation omitted).  An element in an accused product is "equivalent to a claimed element if the differences between the two" are "insubstantial." *Id.*

impermissible doctrine of equivalents opinion.  Such contention requires a leap from showing limitations literally met to a position that the "angled rim" is "equivalent to" or has differences that are "insubstantial" from the claimed upwardly projecting bead, which is a classic doctrine of equivalents theory.

Because Inline failed to show that the Accused Products literally contain a "raised portion of the upper peripheral edge that substantially surrounds the outer edge of the outwardly extending peripheral flange," Lacerta is entitled to judgment of non-infringement as a matter of law on all asserted claims of the '003 patent and the '680 patent, and on claim 5 of the '640 patent.

**B.     The Accused Products also do not have an "upper peripheral rim" that "substantially surround[s] the outwardly extending peripheral flange."**

All of the asserted claims of the '580 patent and '756 patent require, either explicitly or by dependence, that the upper peripheral rim be configured to "substantially surround the outwardly extending peripheral flange of the cover portion" to hinder access or render the outwardly extending flange of the cover portion relatively inaccessible when closed. [6]  The Court construed "configured to substantially surround the outwardly extending peripheral flange of the cover portion" to mean "configured to physically impede access to the outwardly extending flange of the cover portion when the container is closed."  Dkt. No. 53 at 17.  For the same reasons previously discussed with respect to why Inline has not shown that any of the Accused Products meets the "upwardly projecting bead" limitation, Inline has not shown that any of the Accused Products meets the "upper peripheral rim" and "substantially surround" limitations.

Specifically, Dr. Kazmer has not opined that the Accused Products literally have an upper peripheral rim configured to physically impede access to the outwardly extending flange of the cover

---

[6] Inline asserts claims 1-4, 8-9, and 15 of the '580 Patent, and claims 1, 3, and 5-8 of the '756 Patent.  *See* Dkt. No. 298 (Inline's Trial Brief) at 10, 11.

portion when the container is closed.  Instead, his testimony acknowledges that a claim with an "upper peripheral rim" limitation is like one with the upwardly projecting bead limitation.  Trial Tr. 7-40:14-7-41:5 (addressing claim 1 of the '756 ("upper peripheral rim") and claim 1 of the '003 ("upwardly projecting bead")).  Dr. Kazmer offers an analysis-free response with respect to claim 1 of the '756 Patent (*i.e.* with "upper peripheral rim" limitation) by stating that "I've spoken about these requirements with regards to, you know, the '003 patent, and all of the accused products definitely provide each of the required elements."  *Id.*  But simply saying something "definitely" meets a limitation without identifying a basis is insufficient to <u>avert</u> JMOL of non-infringement.  *Paradox Sec. Sys., Ltd.*, 388 F. App'x at 982 (affirming JMOL of non-infringement where nothing "in evidence that unequivocally identifies" a particular limitation); *Kim v. ConAgra Foods, Inc.*, 465 F.3d at 1320.

Dr. Kazmer's only distinction between the two claims, one with and one without an upwardly projecting bead limitation, is that "the word 'bead' is not explicitly required" in claim 1 of the '756 patent.  Trial Tr. 7-41:6-18; *see also id.* at 7-50:7-15 ("claim only requires that the upper peripheral rim extend substantially about the perimeter of the container and is configured to substantially surround" the flange of the cover "to hinder access").[7]  Just as with the claims with the "upwardly projecting bead" limitation addressed above, Dr. Kazmer does not provide any further analysis as to how the Accused Products purportedly have a peripheral flange that is rendered relatively inaccessible when closed.  His testimony was entirely conclusory, and does not point to any structure performing that function.  For example:

> **A:** . . . So, in other words, the word 'bead' is not explicitly required in this claim.
> **Q:** All right.
> **A:** Only that the product is configured so that the per – the peripheral flange is rendered relatively inaccessible when the container is closed.

---

[7] Dr. Kazmer improperly stated "to hinder access **to the container**" though the claim limitations require hindered access / relative inaccessibility **to the outwardly extending peripheral flange**.  Trial Tr. 7-50:7-15 (emphasis added).  The Court struck other testimony regarding the scope of the upper peripheral rim.  *Id.* at 7-44:2-24; 7-50:4-5.

> **Q:** And does the upper peripheral rim of the accused products function in that way, Dr. Kazmer?
>
> **A:** Yes, they do.
>
> **Q:** And so is it your opinion that this -- that limitation is literally met, Doctor?
>
> **A:** It is literally met.

Trial Tr. 7-41:17-7-42:3.

For the same reasons explained above with respect to the "upwardly projecting bead," Inline has not introduced sufficient evidence of infringement.  At best, Dr. Kazmer's opinion as to the upper peripheral rim is an improper doctrine of equivalents opinion and is insufficient to establish literal infringement as required in this case.  Accordingly, Lacerta is entitled to judgment as a matter of law on all asserted claims of the '580 and '756 patents.

### C. The Accused Products do not have a structure to render the flange "relatively inaccessible" nor to "hinder access."

Claims 1–3, 6, 7, 9, 17–20, 24, and 25 of the '003 patent and all of the asserted claims of the '680 patent require, either explicitly or by dependence, that the *upwardly projecting bead* either be "configured to render the outwardly extending flange of the cover portion **relatively inaccessible** when the container is closed" or "to **hinder access** to the container when the container is closed."  Claim 5 of the '640 patent similarly requires that the *upwardly projecting bead* is "configured to substantially surround an edge of the outwardly extending peripheral flange of the cover portion to **hinder access** to the container when the container is closed."  All of the asserted claims of the '580 patent and '756 patent similarly require, either explicitly or by dependence, that the *upper peripheral rim* either be configured "to **hinder access** to the container when the container is closed" or "to render the outwardly extending flange of the cover portion **relatively inaccessible** when the container is closed."  The Court construed the terms "relatively inaccessible" and "hinder access" to have identical constructions: "physically impedes access from fingers or any other object to separate the cover portion from the base portion." Dkt. No. 53 at 19.  Inline did not present any evidence that the Accused Products contain an upwardly

projecting bead or upper peripheral rim that extends about the perimeter or substantially surrounds the outwardly extending peripheral flange to render the flange "physically imped[ed from] access from fingers or any other object to separate the cover portion from the base portion."

When purporting to analyze the Accused Products, as with the upwardly projecting bead limitation, Dr. Kazmer testified contrary to the Court's claim construction and improperly substituted a "visual" component, contending this limitation is met because the cover flange "is relatively inaccessible, so both visually and tactically it is hard to get to." Trial Tr., 6-126:4-13 (discussing '003, claim 1). Again, when asked directly whether the Court's claim construction was met, Dr. Kazmer testified in conclusory fashion "Absolutely" (*Id.* at 6-136:20-6-137:1), but nowhere did he engage the language of "physically imped[ing] access." This does not meet Inline's burden to proffer evidence of literal infringement and, again, offers at best an improper doctrine of equivalents opinion.

Because Inline failed to show that the Accused Products have an upper peripheral rim or upwardly projecting bead that "physically impedes access from fingers or any other object to separate the cover portion from the base portion," Lacerta is entitled to judgment of non-infringement as a matter of law on claims 1–3, 6, 7, 9, 17–20, 24, and 25 of the '003 patent; the asserted claims of the '680 patent; the asserted claims of the '580 patents; claim 5 of the '640 patent; and the asserted claims of the '756 patent. *See* Dkt. No. 298 (Inline's Trial Brief) at 7-11.

**D.    Inline additionally failed to submit any evidence of 21 of its asserted claims.**

Furthermore, Lacerta is entitled to judgment as a matter of law regarding the alleged infringement of the following claims that were identified in Inline's Trial Brief (Dkt. No. 298), but for which Inline did not elicit any testimony at trial:

i.    '003 Patent : 6, 7, 9, 17, 18, 19, 20, 25

ii.    '680 Patent : 4, 5, 7, 9, 18, 19, 21, 23

iii.    '756 Patent : 5, 8

10

    <u>iv.</u>   '580 Patent : 2, 3, 15

Even though Lacerta disputes that Dr. Kazmer performed a proper element-by-element analysis for *any* of the asserted claims, Lacerta also notes that Dr. Kazmer failed to make *any mention at all* of the above claims.[8]  Accordingly, the jury has no basis upon which it could properly find infringement.  In an infringement action, directed verdict is appropriate as to asserted claims for which no evidence is proffered.  *See, e.g., Coal Processing Equip., Inc. v. Campbell,* 578 F. Supp. 445, 467 (S.D. Ohio 1981) ("lack of proof was the reason for the Court's directed verdict against [party] on those claims").

Because Inline has not introduced legally sufficient evidence for a jury to find that the Accused Products literally infringe any asserted claim of the patents-in-suit, the Court should grant Lacerta judgment as a matter of law that Lacerta has not infringed any of the patents-in-suit.

## II.   Inline's Damages Claims Fails as a Matter of Law.

Inline asserts that it is entitled to two types of damages: (1) lost profits, and (2) reasonable royalty on products for which lost profits are not proven.  *See* Dkt. No. 300 at 4-5.  Its damages expert, Christopher Barry, presents a hybrid approach in which the damages would be a combination of lost profits and reasonable royalty, depending on the extent of the lost profits.  Trial Tr. 7-80:19-7-81:1.  Mr. Barry concludes that, should infringement be proven, lost profits damages would apply to about 64% of Lacerta's accused infringing sales.  *Id.* at 7-101:7-13.  Thus, under Mr. Barry's framework, the reasonable royalty would apply to (a) the portion of infringing sales not covered by lost profits (about 36% of sales) or, (b) if lost profits cannot be shown, then to total infringing sales.

---

[8] Dr. Kazmer's testimony appears to assume that Inline has dropped these previously asserted claims.  *See* Trial Tr., 7-20:16-19 ("**Q.** So to recap, what is your conclusion as to '003 patent Claims 1, 2, 3, 21, 22, and 24?  **A.** So all of the accused products literally infringe, you know, all the asserted claims of the '003 patent."); *id.* at 7-20:20-7-40:9 (mentioning *only* claims 1, 2, 3, 6, 8, 17, 20, 25, and 27 of the '680 patent); *id.* at 7-40:10-13 ("**Q.** Okay. So moving to the '756 patent, Dr. Kazmer, can you let us know which claims and products are at issue here?  **A.** So all of the accused products, now all five categories are accused of infringing Claims 1, 3, 6, and 7."); *id.* at 7-48:16-23 (mentioning *only* claims 1, 4, 8, and 9 of the '580 patent).

11

The amount of a prevailing party's damages for patent infringement is a finding of fact on which the patent owner bears the burden of proof by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,* 926 F.2d 1161, 1164 (Fed. Cir. 1991). Inline has failed to proffer legally sufficient evidence in support of its theories of monetary damages.

### A.    Inline failed to prove its lost profits theory of damages.

To recover lost profits damages for patent infringement, a patentee must show that it would have received the additional profits "but for" the infringement. *See Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC,* 350 F.3d 1327, 1346 (Fed. Cir. 2003) (vacating and remanding lost profits award) (quotation omitted). "A patentee cannot obtain lost profits unless it and only it could have made the sale—there are no non-infringing alternatives or, put differently, the customer would not have purchased the product without the infringing feature." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1289 (Fed. Cir. 2017).

"[T]he availability of lost profits is a question of law for the court, not the jury." *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007) ("[o]nly after the court has decided, as a matter of law, that lost profits are available does the jury then get to determine the amount of those lost profits.") (citations omitted). In *Wechsler*, the Federal Circuit noted that the plaintiff had failed to prove it had the capacity to manufacture an embodying product during the period of infringement or had lost subsequent sales. *Id.* at 1293-94. Consequently, the court found the jury's award of lost profit damages was not supported by substantial evidence and the district court had erred in denying a motion for JMOL on the issue of lost profits. *Id.* Similarly here, Inline has failed to put forth sufficient evidence to prove an entitlement to lost profits, and it is the province of the Court, not the jury, to make this determination.

Mr. Barry identifies the *Panduit* framework as the proper analysis for determining lost profits. Trial Tr. 7-82:17-21; *see Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978). To establish an entitlement to lost profits under the *Panduit* factors, Inline bears the burden of proving

(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of profit that the patentee would have made. *Panduit*, 575 F.2d at 1156.  When a patent owner fails to put forward facts supporting one or more of these elements "the court is left with no alternative" and must reject a claim for lost profits.  *See Kearns v. Chrysler Corp.,* 32 F.3d 1541, 1552 (Fed. Cir. 1994).

Courts, as in *Wechsler,* have resolved lost profits demands outside the jury's purview.  486 F.3d at 1293 (Fed. Cir. 2007); *see also Go Med. Indus. Pty, Ltd. v. Inmed Corp*., 300 F. Supp. 2d 1297, 1316– 17 (N.D. Ga. 2003), *aff'd*, 471 F.3d 1264 (Fed. Cir. 2006) (granting summary judgment to defendants on issue of lost profits).  In *Go Med. Indus.,* the court noted plaintiffs failed to establish lost profits for a few several reasons, including failure to show the absence of acceptable non-infringing products.  In *Go Med*, the evidence demonstrated that some customers who used the patented product switched to other products, including a non-infringing product. 300 F. Supp. 2d at 1316–17 (also finding evidence of manufacturing capacity impermissibly speculative).

Inline's request for lost profits fails under the *Panduit* test because Inline's proffered evidence does not meet at least prong two (an absence of acceptable non-infringing substitutes) or prong three (capability to exploit demand for the Accused Products during the period of alleged infringement) of *Panduit*, as detailed below.

       1.    <u>Inline failed to prove an absence of noninfringing substitutes under *Panduit* prong 2.</u>

"The second [*Panduit*] factor, absence of acceptable non-infringing alternatives, often proves the most difficult obstacle for patent holders. Under this factor, if there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." *MentorGraphics*, 851 F.3d at 1286.  "[I]f ***the realities of the market*** are that others would likely have captured sales made by the infringer, despite a difference in the products, it

follows that the 'but for' test is not met." *SmithKline Diagnostics*, 926 F.2d at 1166 (emphasis added) (citation omitted). Inline's failure to show "an absence of acceptable noninfringing substitutes" is fatal to its claim for lost profits. *See Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991) (affirming district court's denial of Slimfold's claim for lost profits damages based on Slimfold's failure to establish the lack of acceptable non-infringing substitutes).

First, though Inline's expert has attempted to redefine the relevant market as a two-supplier market, confining it to packaging that incorporates the exact limitations covered by the asserted patents, Inline failed to demonstrate that the market is so limited. In *Slimfold*, the Federal Circuit explained that, to prove alternative items "cannot be acceptable non-infringing alternatives because they do not have the advantages of the" patent, the patentee must "show[] that consumers specifically want a device with those advantages." *Id.* at 1458. "Consumer demand defines the relevant market" and where "the alleged substitute differs from the patentee's product" – for example in the physical and functional attributes of the products – "the patentee often must adduce economic data supporting its theory of the relevant market in order to show 'but for' causation." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1355 (Fed. Cir. 1999) (citation omitted). Inline did not present legally sufficient evidence that demand for the patented features drives demand for the Accused Products—or, in other words, that demand for the patented features is driving consumer purchase.

Inline proffered no evidence or testimony as to *actual* consumer behavior to support its expert's assumption that consumers would not purchase the Accused Products without the patented features. To the contrary, Inline's damages expert, Christopher Barry, testified that there are "plenty of other competitors offering te/tr [tamper-evident/tamper-resistant]" packaging. Trial Tr. 7-89:2:4. Mr. Barry acknowledged that whether a product is "acceptable" under the *Panduit* framework means whether a *consumer* would view the non-infringing alternative as acceptable. *See, e.g., id.* at 7-89:15-19 (testifying

14

acceptable products are those a consumer would view "as an adequate replacement for the type of products that are made using the patents-in-suit."). Nonetheless, he based his assumption that the non-infringing alternatives are not "acceptable" on information provided by Inline's technical expert, Dr. Kazmer. *Id.* at 7-89:24-7-90:10. Even that analysis was based on certain specific forms of tamper-evident packaging being purportedly not acceptable. *Id.* (listing only products with labels, shrink bands, buttons, and "various non-patented manufacturing processes"). Thus, Mr. Barry's analysis failed to meet the standard that an expert must identify facts, economic data or financial data, to support his testimony about the nature of the market. *EZ Dock v. Schafer Systems, Inc.*, No. 98-2364, 2003 U.S. Dist. LEXIS 3634, at *16 (D. Minn. Mar. 8, 2003) (excluding expert report with no facts to support testimony regarding "demand for the patented product, the availability of non-infringing alternatives, or the nature of the market as a two-supplier market."); *see also Bio-Rad Labs, Inc. v. 10X Genomics, Inc.*, No. 15-152-RGA, 2018 U.S. Dist. LEXIS 167104, at *18-*19 (D. Del. Sept. 28, 2018) (excluding lost profits opinion where the patentee's damages expert relied on the technical expert's opinion that there were no acceptable non-infringing alternatives and did not identify any economic or financial data supporting the alleged two-supplier market).

Mr. Barry's opinion did not address certain forms of available non-infringing tamper-evident and tamper-resistant packaging or whether Dr. Kazmer considered them to be inferior, such as those with corner tabs. Trial Tr. at 7-139:20-7-141:68. Instead, Mr. Barry relied on an improper *ipso facto* opinion that because the "group of customers that bought the Lacerta accused products already evidence an interest in the particular features and benefits that the patented products confer" and "are willing to pay a premium for a version of the TE-TR" that has the patented benefits, they would only buy infringing products. *Id.* at 7-102:14-7-103:6. Mr. Barry is not an expert as to customer acceptability, and he did

not conduct any consumer study analysis to determine what, if any, non-infringing alternatives *consumers* deem acceptable or not. *Id.* at 7-138:21-23; 8-15:16-8-16:10.

In fact, the evidence submitted in Inline's case-in-chief reflects that Inline's customers did find non-infringing alternatives acceptable. Notably, Inline's president, Tom Orkisz, testified that Inline has lost sales to Eatery Essentials tamper-evident/tamper-resistant packaging and that such packaging is a non-infringing alternative. *Id.* at 3-81:16-20. Mr. Schleicher of Inline further testified that Eatery Essentials, along with "several different manufacturers," offers a container with corner tabs; Eatery Essential's container holds fresh fruit. *Id.* at 5-117:5-5-118:24 (affirming Eatery Essentials sells to East Cost Fresh and Lancaster Foods).

The evidence also shows that non-patented features can sway customer preference within the market. As Mr. Orkisz explained, some customers care about fast speed to market, a metric that Lacerta fulfills. *Id.* at 3-82:5-10. Some customers, like Del Monte, want packaging updates along with fast turn-around. *Id.* at 3-106:5-3-107:4. Other differentiators important to some customers include custom work for low volume, pricing, and recycled content. *Id.* at 3-82:18-3-83:19.

As Mr. Orkisz also acknowledged, Inline cannot claim lost sales on products a customer wants and Inline cannot deliver. *Id.* at 3-87:23-3-88:1. For example, though Mr. Orkisz complained that Inline lost 7-Eleven business to Lacerta, his testimony confirmed that loss was not due to any allegedly patented features; rather, 7-Eleven wanted a custom product that Inline "chose not to deliver[.]" *Id.* at 3-26:14-23. Other customers preferred smooth walls, but when Lacerta launched its smooth-walled Fresh 'n Sealed line, the majority of Inline's Safe-T-Fresh products had ribbed walls. *Id.* at 3-101:9-3-103:3. Additionally, Inline did not introduce post-consumer recycled material products prior to March or April of 2020, while many other competitors in the rigid plastic container market did so. *Id.* at 3-86:1-3-87:2 (Pactiv, EasyPak, Eatery Essentials, Direct Pack, Lacerta). Finally, Mr. Orkisz confirmed that Inline

16

does not offer, or did not offer before this litigation commenced, the same size, shape or geometry as approximately half of the 18 Accused Products. *Id.* at 3-94:13-3-100:3.

Second, the testimony and evidence presented in Inline's case-in-chief show numerous competitors in the market of tamper-evident, tamper-resistant packaging. Among these, as confirmed by witness testimony, are a number of competitors that do not stand accused of infringement, including Eatery Essentials, Anchor, Dart, and EasyPak.

For example, Eatery Essentials is a competitor to whom Inline has lost sales "on a couple of accounts," according to Mr. Orkisz's testimony. Trial Tr. 3-81:16-20; *see also id.* at 5-117:5-5-118:20 (sells containers with corner tabs and to hold fruit). Inline's Tom Schleicher testified that employees going from Inline to another company is indicative of competitiveness, and Inline employees have gone to Eatery Essentials. *Id.* at 5-131:5-8, 20-22. In spite of this evidence of competition, Mr. Barry did not disclose any opinion that the Eatery Essentials tamper-evident product is inferior to Safe-T-Fresh. *Id.* at 8-23:24-8-24:2. Nor does he know how much business Eatery Essentials has taken from Inline. *Id.* at 8-18:1-11 (also acknowledging Mr. Orkisz's testimony that Eatery Essentials offers a non-infringing tamper-evident products and that Inline has lost business to them).

Similarly, multiple witnesses confirmed that Anchor sells tamper-evident/tamper-resistant containers, including Mr. Stein, who worked at Anchor until last November. *Id.* at 6-53:25-6-54 (Anchor's containers compete with Safe-T-Fresh):5; 6-54:13-23; *see also id.* at 4-44:4-10 (Daniel Landan's testimony that Anchor sells or has sold a tamper-evident container). Nevertheless, Mr. Barry could not recall any disclosed opinion that Anchor's tamper-evident product is inferior to Safe-T-Fresh. *Id.* at 8-24:7-10.

Dart, too, is one of several companies that sells or has sold "a tamper evident-tamper resistant product" in the rigid plastic market into which Safe-T-Fresh products are sold, according to the testimony

17

of Mr. Orkisz and Mr. Landan.  *Id.* at 3-53:7-20;[9] 4-44:11-19.  Once again, Mr. Barry could not recall any disclosed opinion that Dart's tamper-evident/tamper-resistant product is inferior to Safe-T-Fresh. *Id.* at 8-25:6-9.[10]

EasyPak (an earlier Inline target) does not pay any ongoing royalty and continues to sell into the tamper-evident/tamper-resistant market. *Id.* at 3-59:4-15; 8-19:1-14.  In fact, Mr. Schleicher testified that EasyPak's tamper-evident/tamper-resistant containers compete with Inline's Safe-T-Fresh products at retail stores including Whole Foods.  *Id.* at 5-112:14-21.  These products are on the same shelves next to Inline's products today.  *Id.* at 5-112:23-5-113:17.

Inline made much of emails purportedly inviting Lacerta to compete against Inline.  Trial Tr. 4-89:7-4-90:9 (discussing Exhibit 89 and that Lacerta did not win the business); 4-90:10-4-91:16 (discussing Exhibit 90 as "represent[ing] another instance in which Lacerta was competing with Inline for some business" and that Lacerta won part of the business but that business now "is through Eatery Essentials."); 4-91:17- 4-93:1 (discussing Exhibit 91 as a broker trying to displace Inline from Pioneer Packaging, but that Lacerta did not win the business).  But the evidence showed that within those instances, Lacerta was attempting to sell non-accused products (Lacerta's Fresh-N-Sealed line includes 85 products, of which Inline accuses 18 Inline of infringement in this case).  *Id.* at 4-105:8-13; 4-113:25-4-114:18 (witness does not believe products listed in Exhibit 89 are accused); 4-115:2-21 (Exhibit 91 reflects submission of both accused and non-accused products).  In another, the customer currently purchases a non-infringing product from another competitor.  *Id.* at 4-114:19-4-114:1 (purchaser at issue in Exhibit 90 now purchases from Eatery Essentials).  Thus, the evidence Inline introduced to show

---

[9] Mr. Orkisz also testified that D&Fine Pack and SABIC operate in the rigid plastic market into which Safe-T-Fresh products are sold and "offered a tamper evident-tamper resistant product."  Trial Tr. 3-53:7-20.
[10] The same is true of Placon, another competitor of Lacerta in the tamper-evident/tamper-resistant space identified by Ms. Lotfi.  Trial Tr. 4-92:20-23; 8-25:10-13 (no opinion re: inferiority disclosed by Mr. Barry).

direct competition with Lacerta actually established that Lacerta's non-accused Fresh-N-Sealed products are another example of non-infringing alternatives that compete directly against Safe-T-Fresh.

There also are competitors to whom Inline granted a go-forward license to sell embodying products. Trial Tr. 3-15:3-3-18:1 (discussing settlement and license with Pactiv); *id.* at 3-18:2-3-19:9 (discussing cross-license with PWP and noting neither PWP nor its acquirer had success with the licensed products); Exh. 854 (Pactiv agreement dated Dec. 31, 2020); Exh. 214 (PWP agreement dated Nov. 23, 2009). *See Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1222-23 (Fed. Cir. 1995) (presence of third-party seller who obtained a license from patentee in litigation settlement "could not be ignored" and thus affirming finding the licensee's products were "acceptable non-infringing substitutes" and corresponding limitation of award of lost profits post-license). Mr. Barry affirmed his belief that Inline alleged that Pactiv was capturing some of what otherwise would have been Inline sales. Trial Tr., 8-25:25-8:26-3. As noted above, EasyPak's non-infringing products post-settlement also compete on the same shelves as Inline's.

Mr. Orkisz also confirmed that the sales Inline loses to competitors are not all due to allegedly infringing activity, but rather to a "variety of factors" including price, quality, service, features and benefits, and aesthetics.[11] Trial Tr. 3-49:8-3-50:3. Its customers purchase from a variety of competitors. *See, e.g., id.* at 3-84:23-3-85:1 ("Del Monte purchases containers from many companies[.]"). Moreover, the distributors to whom Inline sells, such as Bunzl, carry multiple suppliers' products. *Id.* at 3-60:25-3-61:5; *see also id.* at 5-120:12 (T. Schleicher: "Our distribution partners can generally sell any product.").[12] According to Mr. Schleicher, 80% of Safe-T-Fresh products are sold through such distribution. *Id.* at 5-119:22-25. In light of this testimony, no reasonable jury could credit Inline's

---

[11] According to Mr. Schleicher's testimony, Inline lost TGD Cuts as a customer due to "Lacerta provid[ing] much more aggressive pricing." Trial Tr. at 5-96:4-21.

[12] Inline sells to various distributors who carry multiple suppliers' products, including Bunzl, Nextera, and Brenmar. Trial Tr. 4-109:21-25 (J. Lotfi).

position that the relevant market for assessing lost profits does not contain any acceptable non-infringing alternatives.

Third, Inline's "hybrid" damages approach does not correct for its failures to prove the absence of acceptable non-infringing alternatives. In order to identify which sales fall within the lost profits, as opposed to reasonable royalty, calculation, Mr. Barry applied three filters: (1) did the Lacerta customer previously buy any product from Inline's embodying "Safe-T-Fresh" line; (2) did Inline offer a matching SKU within 10% of the size of the accused product Lacerta sold; and (3) did Inline offer such product within the same fiscal year of the corresponding Lacerta sale. *See* Trial Tr. 7-95:19-7-95:19. If the sale met each of those three elements, Mr. Barry included it in his lost profits analysis. This resulted in a "capture rate" of 64% of Lacerta's sales of Accused Products. *See id.* at 7-96:20-23; 7-101:7-13. The remaining 36% of the accused sales fall within Mr. Barry's reasonable royalty analysis.

This approach to calculating the share of sales of the Accused Products for which Inline seeks lost profits does not correct for Mr. Barry's improper market definition. To reach a "capture rate" of 64%, Mr. Barry's analysis assumes that no other competitors except Inline and Lacerta would have sold the products that met each of the three filters. Mr. Barry's opinion is thus premised on a ***two-player only*** competitive market for customers that once bought Inline Safe-T-Fresh products, within 10% of the size of accused products, where Inline offered comparably-sized products in the same fiscal year. Mr. Barry's testimony that his analysis allows for competitors due to the 36% of accused sales that comprise his ***reasonable royalty*** conclusion is irrelevant to the flaws in his ***lost profits*** analysis in which the absence of acceptable non-infringing alternatives is Inline's burden to prove. *See* Trial Tr. 7-142:2-13.

Mr. Barry offered no competent testimony or opinion on whether the sales that Inline claims it lost in this case went to competitors other than Lacerta. *Id.* at 8-26:22-8-27:4 ("I don't have that specific tracing ability, so no."). In fact, Mr. Barry acknowledged that there are other manufacturers and

suppliers in the tamper-evident/tamper-resistant market that are available to meet consumer demand.  *Id.* at 8-27:17-25.  The evidence at trial and laid out above affirms that Inline competes with other non-infringing products in the market, has lost sales to them, and in at least one instance declined to fill customer requests for specific products.  Further, Mr. Barry's lost profits analysis encompasses products that are standard, common sizes.  *See id.* at 7-97:3-11 (discussing 64 oz. rectangular package in lost profits calculation); 3-73:14-15 (64 ounce size is "common").

In sum, Mr. Barry's opinion improperly assumes that Inline Safe-T-Fresh customers only buy Safe-T-Fresh or Lacerta accused products of comparable size.  But, that opinion lacks a legally sufficient evidentiary basis for the reasons explained above, including that Mr. Barry disregards sales lost to other non-infringing competitors and also fails to account for whether customers purchase from both the Safe-T-Fresh and other lines.  Nor is it what *Panduit* requires – *i.e.* proof that the patented features drive demand and the absence of non-infringing alternatives that are acceptable to consumers.

For all these reasons, Inline has not met its burden to put forth legally sufficient evidence of the availability of lost profits.

> 2.   Inline also failed to prove capability to exploit demand under *Panduit* prong 3 for the entire damages period.

Inline also failed to establish its capability to exploit demand for the Accused Products during the entire period of alleged infringement under prong three of *Panduit*.  Because of a manufacturing disruption, the evidence in Inline's case-in-chief fails to prove Inline's capability to meet demand for the Accused Products during the entire period of alleged infringement.

Mr. Orkisz acknowledged Inline's inability to meet demand.  For example, he testified that Inline could not supply its own customer demand for five to six months around 2019 due to a cyclone at its raw materials supplier.  Trial Tr. at 2-99:9-2-100:11 ("inferior performance for . . . five or six months" and "hard time delivering orders on time during that period.").  Mr. Orkisz testified that at deposition, he

estimated "on the fly" a cumulative impact of 300,000 cases of material Inline could not sell in that period. *Id.* at 3-74:4-9. Mr. McGuane also acknowledged that Inline lost sales during this period. *Id.* at 5-146:11-18 (noting that "most of [the sales] were delayed" and thus not "anything <u>significant</u> in terms of losses.") (emphasis added).

Mr. Barry's testimony cannot overcome Inline's failure to show its ability to meet capacity during this period as it is not based on the evidence. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). Instead, Mr. Barry concluded that the cyclone did not impact his lost profits analysis with respect to manufacturing capacity because he "think[s], according to Tom Schleicher" the event caused a delay of "five to ten days" to fill orders. Trial Tr. 7-93:12-7-94:10. But, this recollection is an incorrect recitation of the testimony at trial as detailed above; nor did Mr. Schleicher provide any such testimony. Mr. Barry further affirmed that when he issued his original opinion that Inline had sufficient manufacturing capacity to meet excess demand, he was unaware of Mr. Orkisz's testimony that the cyclone-related shortage affected Inline's ability to complete orders of approximately 300,000 cases. *Id.* at 8-46:2-6. Speculation is not a sufficient basis to submit this issue to the jury. *Go Med. Indus. Pty, Ltd.*, 300 F. Supp. 2d at 1316–17 (plaintiffs failed to satisfy the "capacity" prong of *Panduit*, offering only speculative evidence of manufacturing capacity).

Given that Inline was unable to fulfill all of its own orders during this time frame, there is no evidence that Inline could have fulfilled excess supply during that same period, as *Panduit* requires. Therefore, for this additional reason, Inline has not met its burden to submit a legally sufficient evidentiary basis to establish that lost profits are available for at least the six-month period in which its supply was disrupted due to the cyclone.

### III. Inline Fails to Provide Legally Sufficient Support for a Reasonable Royalty Calculation for Infringement of Claims 1-3 and 6 of the '640 Patent.

As with lost profits, a plaintiff bears the burden to establish reasonable royalty damages. *See SmithKline*, 926 F.2d at 1164 ("amount of a prevailing party's damages is a finding of fact on which the plaintiff bears the burden of proof"). "Although a reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty,' the Court must ensure that the jury verdict is supported by sufficient evidence." *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 724 (E.D. Tex. 2011), *aff'd,* 692 F.3d 1351 (Fed. Cir. 2012) (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.,* 69 F.3d 512, 517 (Fed. Cir. 1995)) (evidence was insufficient to support the jury's $208.5 million damages award for infringement where patent owner failed to present evidence of a reasonable royalty based solely on defendant's own use of patented methods).

A plaintiff is not entitled to damages that exceed the value attributable to the patented invention. "What is taken from the owner of a utility patent (for purposes of assessing damages under § 284) is only the patented technology, and so the value to be measured is only the value of the infringing features of an accused product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). "[E]xpert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (quoting *ResQNet.com v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)). "A patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018).

Therefore, the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Id.* (quoting *Garretson v. Clark*, 111 U.S. 120, 120 (1884)); *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp, LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) ("patent owner must apportion

or separate the damages between the patented improvement and the conventional components of a multicomponent product") (listing cases). The Federal Circuit has "required that royalties be apportioned between the infringing and noninfringing features of the product." *Power Integrations, Inc.*, 904 F.3d at 977 (listing cases). A patentee can recover damages based on the value of the entire accused apparatus *only* "when the patented feature is the sole driver of customer demand or substantially creates the value of the component parts." *Id.* at 978-79 (citations omitted). "When the product contains other valuable features, the patentee must prove that those other features do not cause consumers to purchase the product." *Id.* (finding evidence "insufficient as a matter of law to invoke the entire market value rule" even on retrial based on entire market value rule theory where plaintiff previously "did not apportion beyond the 'smallest saleable unit'"). Where analytical errors occur, resulting in a lack of adequate evidence in the record, the damages claim is impermissibly speculative. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) (noting the relevant statute "does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts").

With respect to the reasonable royalty portion of Inline's hybrid approach to damages, Inline has failed to submit evidence by which a jury could determine a non-speculative amount for infringement of claims 1-3, and 6 of the '640 patent.[13] This issue is not one of semantics. These are the four claims on which the Court held Inline is entitled to summary judgment. Dkt. No. 177 at pp. 15-16.[14] At summary judgment, with respect to these claims alone, Inline successfully argued that hindering access to the container cover is not a required limitation. *Id.* at p. 16 (declining to find claim 1 of the '640 patent requires "[t]he upper peripheral rim . . . configured to communicate with at least a portion of the

---

[13] And assuming the jury does not find those claims invalid.
[14] Although the Court also included claim 4 of the '640 Patent in its summary judgment ruling, *see* Dkt. No. 177 at 15, Inline does not contend that the Accused Products infringe claim 4 and did not move for summary judgment on claim 4, *see* Dkt. No. 118 at 17.

outwardly extending peripheral flange of the cover portion to <u>hinder access</u> to the container when the container is closed.") (emphasis added).

As noted above at Section I, the remaining asserted claims all include one or more of the following limitations: "upwardly projecting bead,"[15] "hinders access," or "renders . . . inaccessible." But, at trial, Inline did not offer any evidence that its damages expert accounted for differences in the claims that do <u>not</u> include those additional limitations (*i.e.* claims 1-3 and 6 of the '640 patent). Nor did Mr. Barry offer any testimony as to how to apportion his reasonable royalty analysis and conclusion if the jury is to assess damages for those claims alone – *i.e.* if the jury determines the remaining asserted claims are not infringed and/or are invalid.

In reaching his reasonable royalty conclusion of a 7.5% royalty rate, Mr. Barry testified that he relied on just four licenses – with PWP, EasyPak, Par-Pak, and FlexerPak. Trial Tr. 7-115:8-20. None of these agreements licensed the '640 patent alone or at all. *See* Exs. 214-217.[16] Mr. Barry primarily relied on the EasyPak agreement, which provided a 7.5% royalty rate on past sales. Trial Tr. 7-115:23-7-116:8 (contending that PWP and EasyPak are the "most analogous to the situation we have here" with "EasyPak agreement to be more relevant.") The EasyPak license, or settlement agreement relates to the '003 and '680 patent – not solely the '640 patent. Exh. 216 (EasyPak agreement); *see also* Exh. 214, Schedule A (PWP agreement, listing as Inline's patents subject to license only the '003 patent).

This failure infects Mr. Barry's reasonable royalty opinion as to the '640 Patent claims 1-3 and 6 in at least two ways: (1) he assumed that the royalty rate in a settlement agreement that related solely to the '003 and '680 Patents would apply to the '640 Patent, despite differences in the patented inventions

---

[15] *I.e.* a "raised portion of the upper peripheral edge that substantially surrounds the outer edge of the outwardly extending peripheral flange." Dkt No. 53 at 10.

[16] Exh. 215 is the agreement with ParPak and references the '003 patent. Exh. 217 is the agreement with FlexerPac and references the '003 and '680 patents. To the extent the agreements also apply to any later patents in the same patent family, the agreements still do not contain any evidence of what an alleged infringer would agree to pay solely for the right to use the invention in the '640 patent. *See Mirror Worlds, LLC*, 784 F. Supp. 2d at 725-26.

and their value; and (2) he adjusted the royalty rate upwards under *Georgia-Pacific* factors 9 and 10 to reflect advantages of the patented inventions that are not found in the '640 Patent according to the summary judgment order.  Specifically, Mr. Barry testified that he considered factors 9 and 10 together – as they address "advantages of the patented products over old methods and the benefits of using that technology." Trial Tr. 7-125:7-10.  Yet, in testifying that those factors have an upward impact on the reasonable royalty rate, Mr. Barry referred only to his "understanding" based on information from Mr. Schleicher and Dr. Kazmer about the "substantial benefits to the patented technique of doing these TE-TR containers that the other types don't have."  Trial Tr. 7-125:11-17.  Neither Mr. Barry or either of those witnesses testified about any particular benefits differentiating the asserted claims with the additional limitations versus the '640 patent claims 1-3 and 6.  There is no testimony or other evidence differentiating between what particular features, if any, purportedly drive consumer demand.

Thus, Inline has not provided any evidence by which a jury could assess damages attributable only to infringement of claims 1-3 and 6 of the '640 patent; any such determination would require impermissible speculation.  *See, e.g., TecSec, Inc.*, 978 F.3d at 1291.  Lacerta is entitled to a ruling that Inline cannot proceed to the jury on a claim for reasonable royalty damages on those claims.

## **CONCLUSION**

Lacerta respectfully requests the Court grant this Motion for the foregoing reasons.

LACERTA GROUP, INC.

By its Attorneys,

*/s/ Craig M. Scott*

**Hinckley, Allen & Snyder LLP**
Craig M. Scott, Esq. (BBO No. 556210)
*cscott@hinckleyallen.com*
100 Westminster Street, Suite 1500
Providence, RI 02903
(401) 274-2000 Phone
(401) 277-9600 Fax

Laurel M. Gilbert, Esq. (BBO No. 687760)
*lgilbert@hinckleyallen.com*
Daniel D. Johnson, Esq. (BBO No. 705486)
*djohnson@hinckleyallen.com*
28 State Street
Boston, MA  02109
(617) 345-9000 Phone
(617) 345-9020 Fax

DATED:  February 17, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed through the ECF system on February 17, 2022, and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

*/s/ Daniel D. Johnson*